FILED

2005 MAR 16 A 9: 29

U.S. DISTRICT COURT
NEW HAVEN, CT

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| CECIL YOUNG | : |
| | : |
| Plaintiff, | : |
| | : |
| v, | : CIVIL ACTION NO. 3:03 CV 1010 (JBA) |
| | : |
| CITY OF BRIDGEPORT HOUSING | : |
| AUTHORITY, AND COLLIN VICE, | : |
| IN HER OFFICIAL CAPACITY AS | : |
| EXECUTIVE DIRECTOR OF THE | : MARCH 14, 2005 |
| BRIDGEPORT HOUSING AUTHORITY | : |
| AND IN HER PERSONAL CAPACITY; | : |
| AND THE CITY OF BRIDGEPORT | : |
| | : |
| Defendants. | : |

## MOTION IN LIMINE RE: EVIDENCE OF SECRET BANK ACCOUNTS

The undersigned Defendants, City of Bridgeport Housing Authority ("BHA") and Collin Vice respectfully move this Court, in limine, pursuant to Federal Rule of Evidence 103, to preclude the Plaintiff from offering testimony or other evidence concerning allegations that the Defendants diverted interest from unused funds for police protection, received from the United States Department of Housing and Urban Development (HUD), to a "secret account." The basis of the Plaintiff's claim is based on his misinterpretation of a HUD Audit Report, rumors and speculation on the part of the Plaintiff. The mere mention of an illegal account would be highly

prejudicial to the Defendants and would lead to confusion of the issues in this case. Moreover, such testimony is irrelevant to the issues raised in the Plaintiff's Amended Complaint.

The Plaintiff, Cecil Young, claims that the Defendants, BHA and Collin Vice retaliated against him by eliminating his position with the BHA due to statements he made during two unauthorized tours of BHA complexes that plaintiff carried out in July and August of 2000. Paragraph 14 of the Plaintiff's Amended Complaint states:

> As part of the discussion, [plaintiff] informed the audience of the fact that Vice was not using the federal funds allocated for police protection in the Pequonnock Apartment and Green Homes complexes.

The Plaintiff was deposed on August 30, 2004, at which time the he testified that he told the individuals who attended his tour that the Defendants were not only not using money allocated for police protection, but also that they were "using the money to be going into a private account." See plaintiff's deposition transcript pp 98-99 (Attached hereto as Exhibit 'A'). As part of the Joint Trial Memorandum ('JTM'), the Plaintiff lists as his first proposed exhibit, an excerpt from the City of Bridgeport Housing Authority Audit Report dated July 5, 2000. The Plaintiff states in the JTM that "this exhibit concerns the City of Bridgeport Housing Authority's Private Initiative Account and its alluded to purpose by Chairman of the Board of Commissioners." A copy of Plaintiff's proposed exhibit it attached as "Exhibit 'B'). Part of this

- 2 -

audit report is related to HUD's concern that the BHA had "not established internal controls to properly charge the time the Authority staff worked on the Private Initiative projects." See Exhibit 'B'. HUD concluded that, inter alia, as a result of the lack of internal controls, "the HUD programs have subsidized the cost of administering the Authority's Private Initiative."

In responding to the audit, the report cites a letter written by the Chairman of the Board of Commissioners.

> In December 1999, the Chairman fo the Board of Commissioners wrote to Secretary Cuomo expressing concerns over our review of the Private Initiatives projects. **The Chairman suggested that we alluded to the Private Initiative account as a "secret fund that is used for illegal purposes".** The Chairman further stated, "The creation of the private initiative will afford us the opportunity to develop or grow other resources independent of our Federal resources to help us develop alternate housing choices for our community."

The Plaintiff has interpreted this excerpt to mean that the Chairman told everybody that the BHA has a secret fund that is used for illegal purposes. The Plaintiff was asked about this issue during his deposition by counsel for the City of Bridgeport. It is clear from his testimony that the basis of the plaintiff's allegation that the BHA

> Q. In fact, what you've told people is that the Chairman of the Bridgeport Housing Authority has told everybody that we have a secret fund that's used for illegal purposes?
>
> A. Right.

- 3 -

Q. And that's how you've interpreted that particular quotation?

A. Well, I heard that there was some kind of account, but when he said that, I said, oh, that's the one that they're talking about there.

Q. So, it that how you got the allegation that there's some kind of account that the Bridgeport Housing Authority has?

A. No. I had been hearing that there was some kind of account that they was using for those purposes, but then when he said that, that helped me to feel a little peace of mind that this must be the account that they're talking about.

Q. Did somebody read that to you?

A. Yes.

Q. Did somebody tell you that's what that is to be interpreted as?

A. Yes.

Q. And who was it that did that for you?

A. My lady, we read it.

Q. All right. Now, other that this and your talking to various people who told you about this fund, did you do any research on your own to look and see if you could find the audit that would show how the funds were used for the Bridgeport Housing Authority or did you rely on other people's information.

- 4 -

A. I believe we asked for a copy - - We got a copy of the order of the report and I don't recall what exactly all that was in that, I mean, you know, in terms of whether or not all that was spelled out in there, but, you know.

Q. When you say we, are you talking about you and your friend?

A. Yeah. We requested a copy of the audit report and we got a copy of it.

Q. Were you able to key into one particular part of that audit fund that told you that the fund was used improperly?

A. Right here. The one right here.

Q. Only this? But I'm talking about - -

A. Well, I mean, there might have been something. That was one of the main concerns, I guess, that we highlighted.

Q. And I'm talking about the fund itself. Was there any part of the funding when you looked at that audit, you and your friend, that you highlighted as being a reason that you were going to make the allegations that they were improperly used funds?

A. I don't recall. I thought we had made that allegation long before that even came out.

Q. Okay. So, you made the allegation - -

A. Based on rumors and, you know, those kinds of things.

Q. You made allegations based on rumors?

- 5 -

A.  Well, you know, where there's smoke there's fire sometimes, so, you know, you pass on what you hear sometime and hope that it can be tied up.

Q.  So that you were utilizing what you had heard as rumors from people?

A.  Yeah.

Q.  Before you made that allegation, though, you didn't go and actually have somebody check for you to be sure that what you were - -

A.  Well- -

Q.  Let me finish - - going to say was actually in black and white in the audit fund?

A.  Well, we couldn't get records from Housing Authority on everything we asked for, you know.

Q.  So, you didn't wait until you got the records, you just made the allegation?

A.  We couldn't get the records from everybody from what we wanted.

Q.  So, my question is, you didn't wait for the records, you just made the allegations?

A.  Well, I was going on rumors and what I heard and I was passing on what I heard, you know. When we got the audit report, then that helped reassure me that the worst had been.

Q.  But you were going, basically - - initially you were going on rumors? Is that what you're telling me?

- 6 -

A.   No. Based on what we heard. That's where it all started from, rumors and war, you know. Possibly fire and there's maybe smoke, you know, and those kinds of things.

Q.   Who were you getting these rumors from? Can you tell me?

A.   Various people who was in the Housing Authority.

Q.   Who?

A.   Various employees, different ones here and there that you would walk around and talk with and hear different rumors about different things that were going on, people getting bonuses, people getting, you know, cars and different other things you would hear, that there was parties and they would donate to certain clubs and programs and whatever they would do with it.

Q.   Can you give me the names of these people?

A.   Not offhand, no.

Transcript pp 246 - 253. (Attached exhibit 'C')

It is clear from this exchange that the Plaintiff's claim that the Chairman of the Board of Commissioners told everyone that there was a secret account used for illegal purposes, is based on his misunderstanding of the excerpt from the audit report.

- 7 -

Further, the Plaintiff's conclusion that the BHA diverted interest received on federal funds allocated for police protection to the Private Initiatives Account, is based purely on in admissible hearsay, rumors and speculation.

> Q. Where did you get the information that the Bridgeport Housing Authority was able to make more interest by holding back the money for police protection and then using the interest to use that money in another account?
>
> A. Well, I've been hearing rumors about rumors. Then there was something about some kind of lawsuit that was pending by some company that was going to oversee the Bridgeport Housing Authority, and the lawsuit had been hanged up, the money had been hanged up, put on hold for a while, and I believe, Wayne Haschak, or one of the Commissioners, or Mr. Garcia, one of the Commissioners, raised the issue as to, you know, was there any interest collected off of that money that was put on hold, and if so, where did that money go to, and Mrs. Vice said that she would have to get back to him as to how much interest was generated from that and she would have to get back to him as to where that interest money went to.
>
> Q. And was that something that was just a discussion - -
>
> A. In the minutes. It was in the minutes of one of the Housing Authority Commission's meetings.
>
> Q. Do you know if that was the money that was allocated by the federal government for police protection?
>
> A. I think that was the money that was used for this management firm that was overseeing the Housing authority's operation in terms of redevelopment, new properties all over the city, and I guess they had

- 8 -

maybe hundreds of thousands of dollars, maybe a million dollars of grants that they were going to use to rehab a lot of properties. And, apparently, something went down with the management firm where things clashed and they ended up holding the money up and, you know, whatever interest was generated from that was put in one of those accounts, according to my source.

Q. Okay. So, other than that particular information, did you have any documents that you utilized to show that there was interest that was collected in another account on moneys that should have been used for police protection? I think that's what I'm asking you.

A. Well, the money from the police protection that was generated from the interest would be that money that was taken - - When the detail was cut out and not being used for that time period, and then I think there was a grant that they had also - - They received two grants at one point in time or another, I believe, and, apparently, some interest that might have been generated out of them holding onto that grant before they sent it back might have been used to, likewise, go into that account, then, likewise, the money's that was used for that detail that was put on hold that was cut out for that moment was, likewise, my sources was that that money was also put into those accounts.

Q. Now, when you say your sources, what I'm trying to do is not talk about what you heard from particular people, but I'm asking you do you have any particular documents that show that that's what the Bridgeport Housing Authority did to reduce the police protection in the various housing areas in the city?

A. No, I don't, but I would request a copy of that for you.

Q. So the answer then is that you don't have anything?

- 9 -

A.    I don't have anything specific.

Transcript pp. 153 - 156. (Attached Exhibit 'C')

It is clear from Plaintiff's testimony that his allegation that the BHA diverted interest it received on funds allocated for police protection for HUD, is based on pure speculation. As such, it is inadmissible at the trial of this matter. Moreover, it is beyond the scope of the allegations contained in the Plaintiff's Complaint. Accordingly, the Plaintiff should be precluded from offering any testimony or evidence concerning his unfounded allegation.

The mere mention of an allegedly "secret account used for illegal purposes" would be highly prejudicial to the Defendants, BHA and Collin Vice. As such, the Plaintiff should be prohibited from even mentioning before the jury in this trial.

**WHEREFORE,** the Defendants respectfully move this Court to enter an order precluding the Plaintiff from testifying or offering evidence related to his unfounded claim that the BHA and/or Collin Vice diverted interest from federal funds allocated for police protection to a "secret account used for illegal purposes."

                    THE DEFENDANTS,
                    CITY OF BRIDGEPORT HOUSING
                    AUTHORITY AND COLLIN VICE

By: _____
     James A. Mahar, Esq., (CT 21854)
     Ryan, Ryan, Johnson & Deluca, LLP
     80 Fourth Street, P.O. Box 3057
     Stamford, CT  06905
     Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

I hereby certify that on March _15_, 2005, a copy of the above was mailed to the following counsel and pro se parties of record:

Barbara Brazzel-Massaro, Esq.
City of Bridgeport
Office of the City Attorney
999 Broad Street
Bridgeport, CT 06604-4328

Thomas J. Weihing, Esq.
Daly, Weihing & Bochanis
1115 Main Street
Suite 710
Bridgeport, CT 06604

_/s/ James A. Mahar_
James A. Mahar, Esq.

I:\Procases\1742.008\motinlimineprivateacct.wpd
1742.008

- 12 -